UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | |
|---|---|
| CATHERINE D.,[1] | ) |
| Plaintiff, | ) ) ) |
| v. | ) ) No. 4:23-cv-00079-KMB-TWP |
| MARTIN O'MALLEY,[2] | ) ) ) |
| Defendant. | ) ) |

**ENTRY REVIEWING THE COMMISSIONER'S DECISION**

Plaintiff Catherine D. applied for disability benefits and supplemental security income from the Social Security Administration ("SSA") on August 5, 2021, alleging an onset date of September 30, 2020. [Dkt. 9-2 at 24.] Administrative Law Judge Christopher S. Tindale (the "ALJ") issued a decision on August 17, 2022, concluding that Catherine was not disabled and therefore not entitled to receive the requested benefits. [*Id.* at 24-40.] The Appeals Council denied her request for review on March 9, 2023. [*Id.* at 21-23.] On May 11, 2023, Catherine timely filed this civil action asking the Court to review the denial of benefits according to 42 U.S.C. § 405(g) and 28 U.S.C. § 1361. [Dkt. 1.]

---

[1] To protect the privacy interests of claimants for Social Security benefits, and consistent with the recommendation of the Court Administration and Case Management Committee of the Administrative Office of the United States Courts, the Southern District of Indiana has opted to use only the first names and last initials of non-governmental parties in its Social Security judicial review opinions.

[2] Pursuant to Federal Rule of Civil Procedure 25(d), Martin J. O'Malley automatically became the Defendant in this case when he was sworn in as Commissioner of the Social Security Administration on December 20, 2023, replacing Acting Commissioner of the Social Security Administration Kilolo Kijakazi.

## I. STANDARD OF REVIEW

"The Social Security Administration (SSA) provides benefits to individuals who cannot obtain work because of a physical or mental disability." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1151 (2019). Disability is the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." *Stephens v. Berryhill*, 888 F.3d 323, 327 (7th Cir. 2018) (citing 42 U.S.C. § 423(d)(1)(A)).

When an applicant appeals an adverse benefits decision, this Court's role is limited to ensuring that the ALJ applied the correct legal standards and that substantial evidence exists for the ALJ's decision. *Stephens*, 888 F.3d at 327. "[S]ubstantial evidence" is "evidence that 'a reasonable mind might accept as adequate to support a conclusion.'" *Zoch v. Saul*, 981 F.3d 597, 601 (7th Cir. 2020) (quoting *Biestek*, 139 S. Ct. at 1154). "Although this Court reviews the record as a whole, it cannot substitute its own judgment for that of the SSA by reevaluating the facts, or reweighing the evidence to decide whether a claimant is in fact disabled." *Stephens*, 888 F.3d at 327. Reviewing courts also "do not decide questions of credibility, deferring instead to the ALJ's conclusions unless 'patently wrong.'" *Zoch*, 981 F.3d at 601 (quoting *Summers v. Berryhill*, 864 F.3d 523, 528 (7th Cir. 2017)). "[E]ven under deferential standard of review for social security disability cases, an [ALJ] must provide a logical bridge between the evidence and [the] conclusions." *Jarnutowski v. Kijakazi*, 48 F.4th 769, 773 (7th Cir. 2022) (internal quotations omitted).

The SSA applies a five-step evaluation to determine whether the claimant is disabled. *Stephens*, 888 F.3d at 327 (citing 20 C.F.R. § 404.1520(a)(4); 20 C.F.R. § 416.920(a)(4)). The ALJ must evaluate the following, in sequence:

> (1) whether the claimant is currently [un]employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the [Commissioner]; (4) whether the claimant can perform her past work; and (5) whether the claimant is capable of performing work in the national economy.

*Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000), *as amended* (Dec. 13, 2000) (citations omitted). "If a claimant satisfies steps one, two, and three, she will automatically be found disabled. If a claimant satisfies steps one and two, but not three, then she must satisfy step four. Once step four is satisfied, the burden shifts to the SSA to establish that the claimant is capable of performing work in the national economy." *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).

After Step Three, but before Step Four, the ALJ must determine a claimant's residual functional capacity ("RFC") by evaluating "all limitations that arise from medically determinable impairments, even those that are not severe." *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009). In doing so, the ALJ "may not dismiss a line of evidence contrary to the ruling." *Id*. The ALJ uses the RFC at Step Four to determine whether the claimant can perform her own past relevant work and if not, at Step Five to determine whether the claimant can perform other work. *See* 20 C.F.R. § 404.1520(a)(4)(iv), (v).

If the ALJ committed no legal error and substantial evidence exists to support the ALJ's decision, the Court must affirm the denial of benefits. *Stephens*, 888 F.3d at 327. When an ALJ's decision does not apply the correct legal standard, a remand for further proceedings is usually the appropriate remedy. *Karr v. Saul*, 989 F.3d 508, 513 (7th Cir. 2021). Typically, a remand is also appropriate when the decision is not supported by substantial evidence. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 355 (7th Cir. 2005).

## II. RELEVANT BACKGROUND[3]

Catherine was 40 years old when she applied for disability benefits. [Dkt. 9-5 at 2.] She previously worked as a special education teacher, a nurse's assistant, an occupational therapy assistant, and an interpreter. [Dkt. 9-2 at 69.]

The ALJ followed the five-step evaluation set forth by SSA in 20 C.F.R. § 404.1520(a)(4) and concluded that Catherine was not disabled. Specifically, the ALJ found as follows:

- At Step One, Catherine has not engaged in substantial gainful activity since September 30, 2020, the amended alleged onset date. [Dkt. 9-2 at 27.]

- At Step Two, Catherine has the following severe impairments: diabetes mellitus, gastrointestinal disorder, mood disorder, proliferative diabetic retinopathy, and pilonidal cyst status-post surgical intervention. [*Id.*]

- At Step Three, Catherine does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments. [*Id.*]

- After Step Three but before Step Four, Catherine has the RFC "to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except [that she] can occasionally climb ramps and stairs, but never climb ladders, ropes, or scaffolds. [She] can occasionally balance, as defined by the Selected Characteristics of Occupations (SCO); and occasionally stoop, kneel, crouch, and crawl. She is limited to no fine depth perception, such as threading a needle. [She] can understand, remember, and carry out detailed, but not complex tasks. She can interact occasionally with co-workers and supervisors, but no interaction with the public. She can attend to tasks for a sufficient period to complete tasks. She can manage the stresses involved with detailed work-related tasks. The claimant is limited to no fast production rate or pace work, such as assembly line work." [*Id.* at 28.]

- At Step Four, Catherine is unable to perform any past relevant work. [*Id.* at 38.]

- At Step Five, relying on testimony from the vocational expert ("VE"), and considering Catherine's age, education, and RFC, there were jobs that existed in the national economy that Catherine could have performed through the date of the decision, including Mail Clerk, Marker, Office Helper, Sorter, Document Preparer, and Table Worker. [*Id.* at 38-40.]

---

[3] The relevant evidence of record is set forth in the Parties' briefs and need not be repeated here. Specific facts relevant to the disposition of this case are discussed below as necessary.

### III. DISCUSSION

Catherine raises two issues for the Court's review: (1) whether the ALJ's subjective symptom analysis was patently wrong; and (2) whether the ALJ explained how the evidence supported Catherine's RFC restrictions related to concentration, persistence, or pace. [Dkt. 13 at 10.] The Court will address each issue in turn.

### A. Subjective Symptom Analysis

Catherine argues that the ALJ's subjective symptom analysis was patently wrong because he disregarded her complaints about the intensity, persistence, and frequency of her symptoms based on his alleged errors in reviewing the medical evidence. [Dkt. 13 at 11-12.] She also argues that the ALJ mischaracterized her medical care as "conservative" when she received the standard treatments for type 1 diabetes—medications and dietary and lifestyle modifications. [*Id.* at 12.] She argues that he relied on her non-compliance with medication and treatment to discredit her claims about the intensity, persistence, and frequency of her symptoms without first exploring reasons for her non-compliance and argues that the record shows that her non-compliance arose from her mental health struggles. [*Id.* at 12-13.] She argues that the ALJ relied on her ability to engage in certain daily activities, such as caring for her children, driving, preparing meals, performing chores, shopping, paying bills, and watching movies, without acknowledging certain qualifications on these activities, including that her mother and husband help care for the children and pets, that she bathes only once a week and does not brush her teeth and relies on her husband to remind her to maintain personal hygiene, that she only prepares meals that take ten minutes or less, and that it takes her days to complete chores with family help. [*Id.* at 14-15.] Finally, Catherine argues that the ALJ erred in finding her husband's third-party function report only somewhat persuasive simply because he is biased, has no medical training, and made statements that were inconsistent with the medical record. [*Id.* at 15-16.]

5

In response, the Commissioner argues that the ALJ properly considered the record as a whole in conducting Catherine's subjective symptom analysis, including the objective medical evidence, her conservative treatment, her non-compliance with medication, and her daily activities, as he was required to do under 20 C.F.R. § 404.1545 and SSR 96-8p. [Dkt. 15 at 5.] He further argues that in weighing the medical evidence, the ALJ acknowledged both normal findings, such as exams where providers did not note any physical or mental abnormalities, and abnormal findings, such as fluctuations in blood sugar, abdominal tenderness, treatment for an inflamed cyst, vision issues, and counseling and medication for mood disorders. [*Id.* at 6.] The Commissioner argues that the ALJ expressly noted that Catherine required "fairly extensive" treatment for diabetes but also accurately found that her diabetes improved when she was compliant with ordinary and conservative treatment, including insulin, medication, and lifestyle modifications. [*Id.* at 8-9.] As for the reasons Catherine was sometimes non-compliant with medication and treatment recommendations, the Commissioner argues that the ALJ reviewed the medical records, which indicated that Catherine told her providers that she "forgot" to take her medications, that any suggestion that her mental health issues caused her non-compliance is belied by the medical record showing that she had no issues with impaired memory or concentration, and that Catherine's attorney did not submit evidence or argument that her mood disorders caused her non-compliance. [*Id.* at 10-11.] The Commissioner argues that the ALJ properly identified some qualifications on Catherine's daily activities and was not required to detail each and every factor in conducting her subjective symptom analysis. [*Id.* at 10-11.] Finally, he argues that the ALJ properly weighed the third-party function report from Catherine's husband, noting that it was "somewhat persuasive" given that the husband was biased and has no medical training. [*Id.* at 12-13.]

6

Catherine replies that the ALJ failed to address certain medical evidence—such as diminished sensation in the lower extremities, tenderness, weakness, and range of motion deficits in the shoulders, weakness in the left side of the body, decreased range of motion in the hip and lumbar spine, and abnormal gait—and only summarily mentioned other medical evidence—such as exams where Catherine had mild to severe problems with anxiety and depression, disoriented thinking, and dress and grooming. [Dkt. 16 at 6.] She argues that the ALJ erred by characterizing her treatment as "conservative" without identifying what other more aggressive treatments might have been available. [*Id.* at 6-7.] She characterizes the Commissioner's argument that she had merely forgotten to take her medications as a post-hoc rationalization prohibited by the doctrine set forth in *Securities and Exchange Commission v. Chenery*, 318 U.S. 80 (1943). [*Id.* at 7-8.] She argues that the qualifications on her daily activities are fundamentally more severe than the ALJ's opinion suggests. [*Id.* at 8.] Finally, she argues that that the ALJ erred by discrediting her husband's third-party report based on his lack of medical experience. [*Id.* at. 8-9.]

When assessing a claimant's subjective symptoms, an ALJ will complete a two-step process. First, the ALJ will "consider whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce an individual's symptoms, such as pain." SSR 16-3p (S.S.A. Oct. 25, 2017), 2017 WL 5180304, at *3. Second, "once an underlying physical or mental impairment(s) that could reasonably be expected to produce an individual's symptoms is established," the ALJ will "evaluate the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities." *Id.* The ALJ will not evaluate an individual's symptoms based solely on objective medical evidence unless the objective medical evidence supports a finding that the claimant is in fact disabled. *Id.* at *4-5. The ALJ will consider factors including

7

but not limited to the claimant's daily activities and the effectiveness of the claimant's medication or treatment. *Id.* at *7-8. The court must afford the ALJ's determinations special deference, and it will only reverse if the ALJ's determination is patently wrong. *Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010); *Engstrand v. Colvin*, 788 F.3d 655, 660 (7th Cir. 2015).

Given the substantial deference afforded to an ALJ's credibility determinations, the Court finds that the ALJ's subjective symptom analysis in this case was not "patently wrong" and does not provide a basis for reversal. The ALJ considered the record as a whole, including the factors set forth in 20 C.F.R. §§ 404.1529 and 416.929, in finding that the intensity, persistence, and limiting effects of Catherine's condition were less severe than she alleged. [Dkt. 9-2 at 30.]

In considering the objective medical evidence, the ALJ provided accurate chronologies of Catherine's chronic conditions and described how they improved and declined over time; he did not cherry-pick treatment notes that showed improvement or ignore whole lines of evidence about limiting symptoms. [*Id.* at 30-36.] While the ALJ did not detail each and every symptom in Catherine's medical notes, but he was not required to do so. *See Gedatus v. Saul*, 994 F.3d 893, 901 (7th Cir. 2021) (finding no error where the ALJ's summary of the plaintiff's medical history did not mention every favorable piece of evidence for the plaintiff). Further, Catherine has not explained how the symptoms the ALJ omitted from his written order, such as a lack of range of motion in the shoulders and abnormal gait, fundamentally changed the ALJ's characterization of her condition and course of treatment such that those omissions rendered his analysis "patently wrong." *See, e.g.*, *David C. v. Kijakazi*, 2022 WL 602520, at *8 (N.D. Ill. March 1, 2022) (finding that the ALJ did not err by failing to explicitly discuss medical evidence about the plaintiff's antalgic gait and reduced range of motion in considering his disability claim for a spinal disorder, myotonic dystrophy, and obesity) (citing *Gedatus*, 994 F.3d at 901).

8

Here, the ALJ ultimately concluded that while Catherine required "fairly extensive" medical care, she responded well to ordinary treatments for her conditions, and complications from her conditions largely resulted from her own non-compliance with medication and treatment recommendations. [Dkt. 9-2 at 31.] As explained in the paragraphs below, this conclusion was a reasonable weighing of the relevant evidence that the Court will not disturb.

The ALJ did not err by relying on Catherine's non-compliance with medication and treatment in discrediting her claims about the severity of her symptoms. Non-compliance with treatment is expressly set forth as a factor for evaluating a claimant's symptoms by SSA's own regulations. *See* SSR 16-3p ("[I]f the individual fails to follow prescribed treatment that might improve symptoms, we may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record."). The ALJ did not ask Catherine to explain the reasons for her non-compliance at the administrative hearing, but he was not required to do so. *See Deborah M. v. Saul*, 994 F.3d 785, 790 (7th Cir. 2021) (explaining that SSR 16-3p "did not require the ALJ to ask Plaintiff about her failure to seek treatment. That rule provides that an ALJ must consider possible reasons for a failure to seek treatment," which the ALJ satisfied by reviewing the claimant's medical records). Here, the ALJ considered Catherine's medical records, which showed that she often "forgot" to comply with medications and treatment. [*See, e.g.*, dkt. 9-2 at 31 ("During a follow-up examination in October 2020, the claimant admitted she sometimes forgot to take her prescribed Humalog . . . . Similarly, she indicated that she 'often' misses her medications, including taking her insulin only approximately 25% of the time.").]

Catherine's argument that the ALJ erred by "failing to address the likelihood that Plaintiff's 'poor compliance' with diabetes treatment at times was caused by mental health

9

struggles" is not accurate. [Dkt. 16 at 7.] First, Catherine attributed her poor compliance to forgetfulness, not to a mood disorder or other mental illness. Second, the ALJ considered the possibility that there could have been a mental health or cognitive reason for Catherine's forgetfulness but noted that the medical evidence did not support that: "In addition, the record makes no mention of any chronic issues with the claimant's short- or long-term memory. Indeed, her recent and remote memory is described as intact and there are no noted issues with cognition or intelligence . . . . No doctor has indicated that the claimant was unable to understand their prescribed treatment regimens for the claimant." [Dkt. 9-2 at 35.] Catherine's reliance on *Chenery* is misplaced. Forgetfulness is not a post-hoc rationalization of the ALJ's decision by the Commissioner; to the contrary, the ALJ expressly relied on Catherine's own statements that her non-compliance arose from forgetfulness in his written opinion. [*Id.* at 31, 35.]

The ALJ did not err by characterizing Catherine's treatment as conservative and relying on that characterization in evaluating her subjective symptoms. Applicable SSA regulations state that the ALJ "will consider the type, dosage, effectiveness, and side effects of any medication" as well as "treatment other than medication" in evaluating a claimant's symptoms. 20 C.F.R. § 404.1529(c)(3)(iv), (v) (cleaned up). Catherine's point that her providers' recommendations included the standard treatments for type 1 diabetes and that the ALJ did not identify other treatments she could have pursued is well-taken. However, Catherine does not argue that she required other aggressive treatments for chronic complications from diabetes that would pose a barrier to full-time employment. The ALJ's characterization of Catherine's treatment history—conservative, with occasional acute interventions or hospitalizations due to her own non-compliance with medication and treatment recommendations—was a reasonable weighing of the evidence that the Court will not disturb.

10

The ALJ did not err in weighing the credibility of Catherine's husband's third-party function report. The ALJ noted that Catherine's husband has an interest in Catherine obtaining disability benefits and is not an impartial witness. [Dkt. 9-2 at 37.] Bias is a bedrock factor in considering any witness's credibility. *See United States v. Manske*, 186 F.3d 770, 777 (7th Cir. 1999) ("[D]espite absence of explicit mention of bias in federal rules, bias is [a] permissible and established basis of impeachment. Indeed, it is the quintessentially appropriate topic for cross-examination. Bias is always relevant.") (internal quotations and citations omitted). The ALJ also found that her husband has no medical training and is therefore not trained "to make exacting observations as to dates, frequencies, types, and degrees of medical signs and symptoms, or of the frequency or intensity of unusual moods or mannerisms." [Dkt. 9-2 at 37.] Catherine does not contest this point on the limits of her husband's personal knowledge. Instead, she argues that the ALJ erred because SSA's regulations required him to consider observations by non-medical sources. [Dkt. 13 at 15-16 (citing 20 C.F.R. § 404.1529(c)(3), SSR 16-3p)).] However, these regulations merely require that an ALJ *consider* a non-medical source's observations; they do not require an ALJ to blindly accept those observations as true. In this case, the ALJ considered Catherine's husband's report and found it "somewhat persuasive" to the extent that it was consistent with Catherine's RFC and the preponderance of the medical evidence. [Dkt. 9-2 at 37.] Catherine argues that the ALJ should have articulated which aspects of the medical evidence were inconsistent with her husband's report, but SSA regulations did not require that. *See* 20 C.F.R. § 404.1520c(d) (evidence from non-medical sources are not subject to the factors ALJ's must consider when they weigh the credibility of medical sources). Further, the ALJ noted that Catherine's medical providers found no limitations on her ability to concentrate, which conflicts with her husband's third-party function report. [Dkt. 9-2 at 34; dkt.

11

9-6 at 29.] Taken together, these three considerations of Catherine's husband's third-party function report—bias, lack of knowledge, and inconsistency with medical records showing no deficits in Catherine's ability to concentrate—sufficiently articulated the ALJ's decision to find her husband's report only "somewhat persuasive." *See also Sherman v. Kijakazi*, 2023 WL 5304650, at *6 (C.D. Ill Aug. 17, 2023) (any error in evaluating third-party function report was harmless because the report merely reiterated information in the claimant's own statements, which the ALJ discredited) (citing *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (where a third-party function report merely reiterates information already in the record, it is not a new line of evidence, and the ALJ does not commit reversible error by failing to discuss the third-party function report explicitly)). Accordingly, Catherine has not shown reversible error in the ALJ's credibility determination of her husband's third-party function report.

Finally, to the extent that the ALJ erred in considering Catherine's daily activities, any error would be harmless and would not provide a basis for reversal. The ALJ did not address each and every limitation on Catherine's daily activities, such as the time it takes her to complete household chores. However, the limitation that Catherine repeatedly emphasizes in the briefing—that she requires help and reminders to groom herself and brush her teeth—is addressed and rejected in the ALJ's written opinion. [*See* dkt. 9-2 at 34-35 (noting three counseling and psychiatry appointments where Catherine was described as having "only mild problems with poor dress and grooming," being "casually dressed and groomed," and having "no problems with grooming," and that "other providers failed to note any significant or persistent deficiencies in hygiene or that she wore inappropriate attire").] Even if the ALJ could have taken a more granular approach to Catherine's daily activities and expressly addressed more of her alleged limitations, this would not provide a basis for reversal in light of the ALJ's

other stated reasons for discrediting her claims about the intensity, frequency, and persistence of her subjective symptoms. Ultimately, reviewing courts take a deferential approach to the ALJ's credibility determinations, and the ALJ need only "minimally articulate reasons for crediting or rejecting evidence of disability" to withstand review. *Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir. 1992). The ALJ's reasoning does not need to be "flawless," *Similia v. Astrue*, 573 F.3d 503, 519 (7th Cir. 2009), and will be sustained on review despite isolated errors, *see Halsell v. Astrue*, 357 F. App'x 717, 722-23 (7th Cir. 2009) ("Not all of the ALJ's reasons must be valid as long as *enough* of them are."); *Walcott v. Berryhill*, 2019 WL 2494165, at *8 (S.D. Ind. Feb. 5, 2019) ("Even if this court were to hold that the ALJ should have expressly addressed Plaintiff's activities, any error was harmless because the ALJ provided other reasons for discounting Plaintiff's subjective complaints.").

In sum, Catherine has not identified reversible error in the ALJ's subjective symptom analysis. He considered the necessary factors for assessing credibility as set forth in applicable SSA regulations. He accurately described the chronologies of Catherine's illnesses and did not cherry-pick or mischaracterize the medical evidence. He reasonably determined that Catherine generally received conservative treatment for diabetes and that occasional complications requiring acute interventions resulted from her own inexcusable failure to comply with medication and treatment recommendations. The ALJ considered and weighed her husband's third-party function report. To the extent the ALJ erred by not addressing each and every limitation on Catherine's daily activities, any error would be harmless given the totality of the ALJ's analysis. Accordingly, Catherine's request for remand on this issue is denied.

## B. RFC Restrictions

Catherine argues that the ALJ did not explain how her RFC, which limits her to "no fast production rate or pace work, such as assembly line work" addresses her limitations in concentration, persistence, or pace. [Dkt. 13 at 16-20.] She argues that her fluctuations in blood sugar, her anxiety and depression, and the side effects of her medications cause fatigue, headaches, frequent urination, vomiting, diarrhea, panic attacks, and indifference. [*Id.* at 17-18.] Given these symptoms, Catherine argues that the ALJ should have found that she has moderate limitations in concentration, *and* persistence, *and* pace, and that her RFC does not account for all three of these deficits. [*Id.* at 18-19.] Even if the RFC does adequately account for these deficits, she argues, the jobs that the ALJ found she could perform at Step 5 involve a temperament factor of "R" in the Department of Labor's *Revised Handbook for Analyzing Jobs* ("*RHAJ*") and would exceed her capabilities because the ALJ found that she cannot perform fast production rate work. [*Id.* at 19.] She also argues that the RFC does not account for her need for substantial off-task time to accommodate her frequent headaches and other symptoms. [*Id.* at 19-20.]

The Commissioner responds that Catherine's RFC includes limitations in addition to "no fast production rate or pace work, such as assembly line work," that account for her medical conditions. [Dkt. 15 at 13-14.] These limitations include her ability to "understand, remember, and carry out detailed, but not complex tasks" and her ability to "interact occasionally with co-workers and supervisors, but no interaction with the public." [*Id.*] He argues that there is no evidence of impaired concentration or cognition in the treatment record, and that the state agency consultants did not opine that Catherine has limitations in concentration or persistence. [*Id.* at 13-14.] He points out that the consultants did not find a limitation on Catherine's pace either and that the ALJ independently added this limitation to account for her difficulties managing stress. [*Id.*]

14

He argues that the ALJ reasonably relied on the VE's testimony about jobs Catherine could perform given her RFC and that the ALJ did not find that Catherine required significant time off task. [*Id.* at 15-16.]

In reply, Catherine argues that the ALJ erred in conducting her subjective symptom analysis and should have found limitations in concentration and persistence and a requirement of substantial time off-task or absent. [Dkt. 16 at 10-13.] She also argues that the ALJ had an independent duty to assess the VE's testimony and address any discrepancies with the *RHAJ*. [*Id.* at 13-14.]

An ALJ need not use any "magic words" when formulating a claimant's RFC. *Crump v. Saul*, 932 F.3d 567, 570 (7th Cir. 2019). However, "the ALJ must explicitly account for all of a claimant's limitations in [his] hypothetical, including limitations in concentration, persistence, or pace, unless the vocational expert has independently reviewed the medical record. *DeCamp v. Berryhill*, 916 F.3d 671, 675 (7th Cir. 2019). "[B]oth the hypothetical posed to the VE and the ALJ's RFC assessment must incorporate all of the claimant's symptoms supported by the medical record." *Yurt v. Colvin*, 758 F.3d 850, 857 (7th Cir. 2014).

The Court is not persuaded by Catherine's arguments and finds that she has not shown reversible error on this issue. As an initial matter, the Court has already found that the ALJ did not err in conducting the subjective symptom analysis, and he was not required to accept as true Catherine's claims about the intensity, frequency, and persistence of her symptoms. *See supra* Sec. III-A. The specific argument that Catherine makes about the ALJ's subjective symptom analysis with respect to this issue is also unpersuasive. The ALJ noted that Catherine's medical records showed that she had "no problems with poor concentration," and the state agency consultants also found no limitations on concentration or persistence. [Dkt. 9-2 at 34; dkt. 9-3 at 11, 22, 31, 42.] For the reasons set forth in the previous section, the ALJ was not required to credit the husband's

15

third-party function report stating that Catherine has trouble paying attention, [dkt. 9-6 at 29], or Catherine's own statements about difficulty with concentration, [dkt. 9-6 at 21], over the assessments of Catherine's medical providers and the state agency consultants who all opined that she did not have limitations in this domain.

Moving on to whether the RFC adequately accounts for Catherine's limitations in pace, the Court finds that the ALJ did not commit reversible error on this issue. The ALJ explained that even though Catherine had no limitations in concentration and persistence, and even though none of the state agency consultants found that she had any limitations in pace, he limited her to "no fast production rate or pace work," including assembly line work, in order to "accommodate[] any reduced stress tolerance and ensure[] that [she] is able to adapt and manage herself in a work setting." [Dkt. 9-2 at 35.] This case is distinguishable from the one Catherine relies on in her opening brief. In *DeCamp*, two state agency psychologists found that the claimant had moderate limitations in concentration, persistence, *and* pace. 916 F.3d at 673. One of the psychologists also found that she had moderate limitations in "perform[ing] activities within a schedule" and "perform[ing] at a consistent pace without an unreasonable number and length of rest periods." [*Id.*] The other psychologist found that she had "extreme" limitations in "withstanding routine work stresses." [*Id.*] Given these expert opinions, which the ALJ found persuasive, the court held that an RFC limiting the claimant to "no fast-paced production line or tandem tasks" did not account for her moderate limitations in concentration, persistence, *and* pace. [*Id.* at 675-76.] Here, by contrast, Catherine does not have moderate limitations in concentration or persistence. No expert found that she has any limitations in pace. The ALJ did not find that she has limitations in maintaining a consistent pace or an extreme limitation in withstanding routine work stresses. Instead, the ALJ added a restriction beyond the experts' recommendations excluding "fast

production rate or pace work, such as assembly line work," to accommodate Catherine's claim about reduced stress tolerance. [Dkt. 9-2 at 35.] The Court finds no error in this additional limitation under the specific circumstances of this case.

The ALJ did not err by excluding from the RFC a requirement that Catherine requires significant off-task time during the workday and would often be absent from work. An ALJ is "only required to incorporate limitations that [he] found [are] supported by evidence." *Alvarado v. Colvin*, 836 F.3d 744, 751 (7th Cir. 2016). An ALJ is not required to list domains for which the claimant has no limitations, as this would be "a needless formality." *Gary B. v. Berryhill*, 2018 WL 4907495, at *3 (S.D. Ind. Oct. 10, 2018). Here, the ALJ did not find that Catherine would frequently be off-task or absent from work and thus was not required to make a finding on those domains in the RFC. [*See generally* dkt. 9-2 at 28-38.] Catherine testified that she suffers from frequent urination, gastrointestinal issues, headaches, fatigue, and panic attacks, [*id.* at 56-58], but as mentioned above, the ALJ was not required to accept her claims about the intensity, frequency, and persistence of her symptoms. *See supra* at Sec. III-A. Catherine provides no binding authority for the proposition that the ALJ must make a finding on each and every domain he references in a hypothetical to the ALJ, and the Court does not find that asking the VE about off-task time and absenteeism required the ALJ to make such a finding in this case. Accordingly, the Court concludes that the ALJ was not required to make a finding about off-task time or absenteeism in the RFC and that Catherine has not shown reversible error on this issue.

Finally, Catherine has not shown reversible error on her Step Five argument and has forfeited that argument for judicial review. The ALJ relied on testimony from the VE that there were significant available jobs in the national economy for a person with Catherine's RFC. When the ALJ bases his decision at Step 5 on the VE's testimony, the ALJ must ensure that the VE's

testimony is the product of a reliable analysis. *Fetting v. Kijakazi*, 62 F.4th 332, 339 (7th Cir. 2023). However, "[w]hen no one questions the [VE's] foundation or reasoning, an ALJ is entitled to accept the [VE's] conclusion, even if that conclusion differs from" the Department of Labor's *Dictionary of Occupational Titles*. *Donahue v. Barnhart*, 279 F.3d 441, 446 (7th Cir. 2002). Thus, when a claimant does not object to or challenge a VE's testimony during the disability hearing before the ALJ, she forfeits any objections she might have raised for judicial review. *See Brown v. Colvin*, 845 F.3d 247, 254 (7th Cir. 2016); *Fetting*, 62 F.4th at 338 ("A claimant who fails to object at the hearing forfeits any challenge to the VE's testimony. This objection must be specific; to avoid forfeiture, a claimant must do more than make a general objection or vaguely ask the VE about his methodology"); *Leisgang v. Kijakazi*, 72 F. 4th 216, 220 (7th Cir. 2023) (reiterating that a claimant "may not start objecting to unquestioned and uncontradicted VE testimony in federal court after the closure of the administrative record" and that when the claimant fails to raise a timely objection, the issue is forfeited unless the VE's testimony is "facially implausible or incoherent").

Even though Catherine was represented by an attorney at her administrative hearing, she did not raise any challenges to the VE's testimony about jobs in the national economy that are available to a person with her RFC. [*See* dkt. 9-2 at 69-73.] The argument that she presents for the first time on judicial review—that the jobs the VE identified would be unavailable to her because they are categorized as temperament factor "R" and therefore involve "performing a few routine and uninvolved tasks over and over again according to set procedures, sequence, or pace with little opportunity for diversion or interruption," [dkt. 13 at 19 (citing U.S. Dep't of Labor, Revised Handbook for Analyzing Jobs 10–1 10-2 (1991)]—does not identify an error in the VE's testimony that is so facially implausible or incoherent that it excuses her forfeiture of the issue. As

18

the Commissioner points out, the description quoted above is a disjunctive test: "procedures, sequence *or* pace." Thus, jobs in the temperament "R" category, such as the ones identified by the VE, do not necessarily require the jobholder to work according to a set pace; they could merely require a set procedure or a set sequence. Even if they did require a set pace, Catherine has not explained why the ALJ should have assumed that the set pace would be a "fast production rate or pace, such as assembly line work," which is a job requirement that the ALJ specifically instructed the VE that Catherine could not meet. Put differently, Catherine could not prevail on the merits of this argument even if she had preserved the issue for review and thus cannot meet the higher standard for error that she is required to meet here to avoid forfeiture. Accordingly, the Court finds no reversible error on this issue.

In sum, Catherine's RFC is supported by substantial evidence, and the ALJ built a logical bridge between the evidence and her RFC. The ALJ did not err by excluding limitations on concentration, persistence, off-task time, or absenteeism in her RFC because he did not find her to be limited in those domains. The RFC adequately encompasses Catherine's pace limitations as described by the ALJ. Catherine challenges the VE's testimony about available jobs in the national economy for the first time on judicial review. The Court is not persuaded that she has identified an error on that issue, let alone an error in the VE's testimony that is so facially implausible that it would excuse her forfeiture of the issue. Accordingly, Catherine's request for remand on this issue is denied.

## IV.  CONCLUSION

The standard for disability claims under the Social Security Act is stringent. *Plessinger v. Berryhill*, 900 F.3d 909, 911 (7th Cir. 2018). "The Act does not contemplate degrees of disability or allow for an award based on partial disability." *Williams-Overstreet v. Astrue*, 364 F. App'x 271,

19

274 (7th Cir. 2010) (citing *Stephens v. Heckler*, 766 F.2d 284, 285 (7th Cir. 1985)). "Even claimants with substantial impairments are not necessarily entitled to benefits, which are paid for by taxes, including taxes paid by those who work despite serious physical or mental impairments and for whom working is difficult and painful." *Id.*  Taken together, the Court can find no legal basis presented by Catherine to reverse the ALJ's decision that she was not disabled during the relevant period.  Therefore, the ALJ's decision is **AFFIRMED**.  Final judgment shall issue accordingly.

    **So ORDERED**.

Date: 8/30/2024

*Kellie M. Barr*
Kellie M. Barr
United States Magistrate Judge
Southern District of Indiana

Distribution:

All ECF-registered counsel of record via email